Court, representing Ricardo Navarrette. This is a failure-to-maintain case. The district court, in applying the discretionary function exemption to the Tort Claims Act, really analyzed it as a failure of design and analyzed the case in terms of the design of the Liberty Glen campground. We maintain, and I think that the correct analysis is that it's really a safety case, which involves the failure to maintain a use path, that is a path that was not designed by the Army Corps of Engineers, but a path that was developed after the Army Corps of Engineers had built and designed the campground. In terms of the analysis of the of the Well, in that respect, the case does differ from, for example, I think it's ARA, where the Forest Service, anyway, the government, built a road and then failed to maintain it. So here you've got a use path which wasn't built by the government, and it just grew. So it's a little different. And the thing that strikes me as being very difficult here is the extent to which the government's obligation flows from some safety standard that's identifiable that you can get your hands around. It's not discretionary. Because it doesn't have an obligation just to make its property safe. I mean, that's clear. So you've got to come back to the very narrow. Well, first off, on the ARA case, I think it is close to the ARA case, because the ARA case was the case of the road going up Denali National Park. The government built the road, and that was certainly discretionary. And they had undertaken to keep it safe, and they didn't. Right. But then the problem was caused by erosion. Yes. And there was erosion on that side of the road, and that's what they failed to maintain. And that's similar to what happened here. Well, no, it isn't, because the government – I mean, the government – it may be that you're correct ultimately, but I'm just trying to focus in. The government here did not build that path. It did not undertake in any sort of demonstrable way a responsibility for maintaining it into its original design, which I believe was the precise requirement in ARA, that the road be maintained as designed. Here they didn't design it, so it didn't have anything to do with the path. I mean, some animal or some kids or whatever created the path. Well, the – but they did have an obligation, which certainly didn't involve any social, political, economic judgment, to maintain the safety of the visitors to a Class A campground. It's like the Indian towing case that goes back to 1955. Well, if the people on the campground had gone off on a hike someplace way out in the boonies and had had an accident, you would not be contending that the government, just because they were at the campground, had an obligation to make their entire visit safe. No, I would not. So come back with me to what your – what actual safety obligation did the government assume? That's what I'm trying to find. The actual safety obligation is first in the safety plan, which says quite specifically and this is on page 53 of the excerpts of record, it says, dangerous terrain conditions such as drop-offs, which is what this was, will be properly marked or fenced. Okay. That's the first – first. Does that cover – is it not discretionary in your view to say dangerous? It's not – no, it's not discretionary. Okay. And even if it is discretionary, Your Honor, I think an argument can be made, there certainly has been one made in this case, that it was a discretionary act, but then the second issue becomes, is it a discretionary act which furthers or has some record-based basis in social, political, or economic policy? The obligation to do – or the fact that the government did nothing about this problem, which was a – let's call it an attractive nuisance because it – in walking down that path in the dark and seeing campgrounds across the way, there was no warning whatsoever that there was a 30-foot ravine at the end of that path. The – Does the government have to maintain those pathways so that they're safe even in the dark? Well, it had to. As opposed to someone taking a walk in normal time in the day? No. I think that the – what the government did or what the government had to do is they could have had something at the board coming into the campground. They could have had a fence. They could have had a sign. I don't know that they had to maintain it in the dark. That – how they solved the problem was up to the government, and we're not quarreling with that. But the critical fact in this case is that the government did absolutely nothing. The regulation or the proviso that you mentioned talks about marked or fence, so I take it that they've already made a decision as to how they could address such an issue. Well, they – That is fenced or marked at a minimum. That's one way they – that's prescribed in those in the safety plan, but I think that what's critical in terms of the analysis and in terms of the decision of the district court is the fact that here the government did absolutely nothing. And in doing absolutely nothing, they weren't furthering any social policy or political or economic policy. It's like – it's unlike the situation where, to answer Judge Reimer's earlier question, going hiking up in the backcountry and then falling off a waterfall such as happened in the Blackburn case. That's completely different because there the government had built a trail. The kid that fell off had strayed off the trail and was injured. In this case, you have something that developed later, such as the mold in the Wise Ant case, which developed later, such as the lighthouse light that went out later in the Indian Towing case, such as the erosion in ARA Leisure Services. So these are – these are things where there's nothing in the record that shows that the government ever thought about the danger here. That's not quite – that's not quite accurate. I mean, because the ranger, whose name I've forgotten, but one of them, she went out there frequently, looked around on the view to see what was going on, and didn't find anything that was regarded as being a problem. And so, as Judge Fischer suggests, it may well be that the decision implicitly was, doesn't need to be fenced, doesn't need to be marked, and for that matter, doesn't need anything. Well, that goes to the negligence question. I don't think that goes to the – that goes to the question of whether it was negligence. I don't know that it goes to the question of whether the exemption applies. But I'm going to sit down and save some time for rebuttal. Surely. Mr. Mardigan. May it please the Court. Good morning, Your Honors. My name is Owen Mardigan, arguing for the United States. This case is about access. It's not about maintenance. And I say that because the appellant began his argument by talking about maintenance, which is understandable given the line of maintenance cases that draws – would draw us away from the discretionary function exception. It's not a maintenance case because the plaintiff has begged the question of what is the problem. The plaintiff talks about how this path is a problem, how it's an attractive nuisance, how it's a maintenance issue. But this isn't the case where you have a path like the road in ARA Leisure that has crumbled away over time and has become by itself dangerous. There is a judgment here about whether this even is dangerous. Is it a maintenance problem? This path, remember, exists because people want to be there. People want to be at this part of the park because it's a pretty area. They've created this path because they want access. Wait a minute now. They create a camp site in a frequently used public campground. Yes. And over time, it becomes clear that people using that site to which they have been given access are using that path to approach a sheer drop-off. And the safety plan that the park is managed under contemplates that there will, in fact, be such kind of hazards and specifically identifies drop-offs as just such a hazard. And not only that, it goes on to say what you do about it, which is you mark it or you fence it. Now, are you arguing that this case, the government has no maintenance responsibility under those conditions? No. The argument is that there's a judgment implicit in getting to that decision to mark or sign something, which is that it's dangerous. The judgment has been made. The judgment has been made by the safety plan, as I'm reading the plain language, that in operating the park and the ground, that there is an obligation to identify hazardous conditions. It has made the judgment that drop-offs are hazardous because that's given as one of the examples. And it's pretty hard to say that a drop-off onto a, what, a 30-foot drop onto a rock isn't hazardous. I think that does require the judgment, Your Honor. I think that the specific language of that rule, which is presented as a guideline, not a hard and fast rule, is that dangerous conditions will be identified, then it throws out as an example drop-offs, et cetera. What's the, what is the, what are, as counsel said, what are the political economic policy decisions that go into that, other than carrying out one's obligation to maintain the park in a safe? There's a balance between where the public should be allowed access in a park and where the public should be prevented access, whether it be to protect nature, to protect the safety of the public. There's a tension that's explicit in these, the policies and the regulations, between allowing the public as much access as possible and protecting natural resources. You don't want people, for example, trampling endangered plants or causing erosion or causing some kind of environmental damage, and protecting safety. So safety is clearly part of the calculus, but what makes it a policy decision is that there is this tension that the Corps contemplates that will go into these decisions. It's frankly the same language that was in Valdez, where the issue is identical to this one, where the plaintiff says that the government constructed a trail and did absolutely nothing at the end of it to warn that people weren't supposed to go climbing off the cliff. The trail, they argued, implicitly led to the cliff, just like they're making that argument here. The government has to decide when it designs a campground specifically to take advantage of surrounding views and specifically with the idea that people are going to use it because it's a beautiful place and they want to maximize public access to all parts of that campground. Where was the path in relation to the campground? Did it kick off right from there or through it? Your Honor, there is a photograph that, through much duplication, may not be the most clear at the excerpts of record, pages 109 and 110, that sort of shows that the campground is a broad, flat area cleared of trees. At the edge of, I suppose it's the western edge of the campground, there's a wooded area that begins. And the path begins kind of at the edge of that wooded area, leads underneath a couple of trees or next to some trees, as is shown. Excuse me, as is shown on the picture. Well, I have the idea that we kind of led into the campground. Am I wrong about that? Well, Your Honor, I can only go by these photographs. It leads, the campground area is fairly large. It's a large field. It's a double-sized campground. The path certainly does not lead to the center of the campground. No. It's arguable whether it's, you know, it leads into that flat area. Yeah. It definitely does. Wouldn't that create a different situation from one in which there would be a path maybe a mile away that people might follow through the trees for beauty and so forth? This is a path that takes off right from the campground? Well, I think it would be a different calculus because the fact that this path leads from the campground shows that it's a path that the, it's where the public wants, it's an area that the public wants access to. So the calculus really has to do with access. Do you allow the public access to that or do you prohibit access? And that's what brings together the policy judgments that are discussed. Well, that's another problem I have with policy as you relate it. It's hard for me to see a policy that would say it would be wrong to protect either by marking or fencing a dangerous area because it might interfere with the enjoyment of nature. Well, if you've got a big drop-off like at the end of a path, it's hard for me to see how that policy applies. Well, Your Honor, the judgment has to be made whether that is dangerous and whether the path really would fool people into walking off a very obvious bluff. The Court said in Valdez, quoting now from page 1180 of that opinion, a degree of judgment is required in order to determine which hazards require an explicit warning and which hazards speak for themselves. So that's the judgment that needs to be made. Was that the end of the path? I'm sorry? Was that the end of the path, the drop-off? Well, I think it would be misleading to say that the path leads to the drop-off. The path leads next to a drop-off. It's a little bit like the drop-off is off to a side and then there is a hill on the other side that's not quite a drop-off. It's just a graded, it's the side of the hill. So a person using the path could go on by the drop-off? I believe so. It's been a number of years since I've been there, Your Honor. Well, I've never been there, so that's why I'm asking. I mean, personally, I think it's obvious that the drop-off is there, and certainly if you go walking in that direction, you're going to go off the drop-off. I mean, unless there's some big wall preventing you, it's going to happen, but it's very obvious. What I was trying to find out is whether people walking, if they did happen to notice that, would go on, continue on the path to other parts of the woods. Your Honor, there's a hillside on the other side, and frankly, I couldn't say. I can't predict how people would treat that situation. But I think it's noteworthy that there's never been an accident there before or since, with the exception of this one, which happened to occur in the middle of the night. Does it make a difference to those at night? I think it does, and I think it's ironic, given the Oberson case, which is, you know, both the parties have discussed, which has to do with the speed limits for a snowmobile and whether they needed to be warranted at a certain speed. The record in that case shows that the Park Service didn't even warrant those trails at night, because it figured that people have to use their judgment and common sense in how they deal with wooded areas at night, and I think that's, frankly, the judgment that has to be made here, and that makes it a balancing of policy factors. I see my time is out. Thank you, Your Honor. Kagan. Thank you. Mr. Schwartz. Schwartz. Thank you. In terms of the description of the path, the path led over the cliff. I mean, this was a path that was about 3 feet wide. It was clearly visible because of the moon, which was fairly bright that night, so there was some illumination, but there was no artificial illumination. There were no lights, street lights or anything of that sort. So the couple is walking down the path, and they literally go off the edge. It was not a matter of making the wrong turn or somehow, you know, missing something on their own. They were led off the edge of a cliff. Now, with regard to the notice, the Army Corps had notice of this. Judge Reimer had said earlier that the ranger had gone out there and didn't see a problem. The ranger was Ranger Wilson, and I think she said that she had gone out there to meditate or she had, you know, gone out to enjoy the scenery, which is certainly something that one would expect a ranger to do. But it really wasn't her decision. The decision really wasn't at her level. The people who were the decision-makers here were the park manager, Mr. Crowley, and then the former manager, Mr. Griffin, and neither of them were they were aware of the path or one of them was aware of the path, but they certainly didn't make any decision to do anything about it. It's like if a log had fallen off the back of a truck into the road in the night off a ranger truck, they would have turned around and they would have pulled that log out of the road because it created a safety hazard. It's the same thing here. A use path was created similar to the log. Nobody did anything about it. Nothing. Thank you. Thank you, Mr. Schwartz, Mr. Griffin. The matter just argued will be submitted. And we'll next hear argument in NEBA versus the Bureau of Land Management.
judges: Hug, Rymer, Fisher